THE BOARD OF TRADE OF THE CITY OF CHICAGO

*v.*

## J. BUCKINGHAM *et al.*

WAREHOUSEMAN'S LIEN—*how lost.* After the great fire in Chicago, on the 8th and 9th days of October, 1871, which destroyed and damaged much of the grain stored in that city, and left the balance exposed to both fire and weather, the board of trade, acting in behalf of unknown owners and parties interested, and with the assent of the several warehousemen, took possession of the grain unconsumed, preserved and sold the same for the benefit of the owners. Previous to the sale, the warehousemen agreed, in writing, with the board of trade, that the latter might sell, the former to receive two cents per bushel as accrued storage thereon. After the sale they claimed a lien on the fund for charges for storage over and above the sum stipulated: *Held*, that, under the circumstances, they had lost their lien for storage, except for two cents a bushel; and that the expense incurred in preserving the grain was a proper charge to be deducted from the fund.

APPEAL from the Circuit Court of Cook county.

Messrs. HITCHCOCK, DUPEE & EVARTS, for the appellants.

Messrs. McCAGG, FULLER & CULVER, for the appellees.

Mr. JUSTICE WALKER delivered the opinion of the Court:

This was a bill in chancery, filed by appellants, in the circuit court of Cook county, against appellees.

It appears that, previous to the 8th and 9th days of October, 1871, there was stored in the elevators, Galena, Hiram Wheeler, Munger and Armour, Nation and Central A, more than a million bushels of grain. By the fire of those dates a large portion of this grain was destroyed or greatly damaged. After the progress of the fire had been arrested, the unconsumed grain in these warehouses still continued to burn, and it was exposed to both fire and weather. The board of trade of the city of Chicago, acting on behalf of the unknown owners and parties interested in the grain, with the assent of the owners of the elevators, took possession of the grain. They employed labor for its preservation, and about the 30th day of the same month sold it at auction, when between $60,-000 and $70,000 was realized from its sale.

Previous to the sale, the warehouse owners stipulated and agreed with the board of trade, that they might proceed to sell the grain, the warehousemen to receive two cents per bushel as accrued storage thereon. The grain was sold subject to this charge, which was paid by the purchaser to the warehousemen.

On the 20th of the following November, the board of trade filed their bill against all unknown persons having any interest in the proceeds of the sale, praying that the sale be approved and the proceeds distributed. Publication was made against the defendants. A decree was subsequently rendered in accordance with the prayer of the bill, and the matter was

referred to the master to take proofs and report who were entitled to participate in the distribution of the fund, and the proportionate share of each claimant.

The owners of the warehouses thereupon filed their petition, alleging that they were warehousemen, and as such had a lien for their charges for the storage of the grain.

The holders of warehouse receipts for this grain also filed their claims before the master, who reported that they were entitled to the fund; but the warehousemen excepted to the report, and on a hearing on the exceptions they were sustained and the case referred back to the master.   He thereupon reported that the several warehousemen had claims for storage, amounting in the aggregate to $25,400.27, and also reported the amount each holder of warehouse receipts was entitled to receive of the balance of the fund.   The report of the master was approved, and a decree rendered requiring the receiver to pay to each claimant reported to be entitled to participate in the fund, the amount he was reported as entitled to receive.   From this decree the board of trade have appealed, and ask a reversal of the decree.

This record presents the question whether appellees, by their acts and agreement, parted with their possession of this grain in such a manner as to lose their lien for storage thereon.   It is conceded that, as a general rule, a person holding such a lien, loses it by voluntarily parting with the property on which the lien exists.   But it is contended that in this case there was not, by the warehousemen, an abandonment of possession to the extent that the lien was released; that the board of trade took charge of the grain for the purpose of preserving as much as could be done, for the benefit of all persons in interest; and that it was not intended to release the lien.   On the other hand, it is urged that, from the entire transaction, it can not be inferred that there was an understanding that the lien was to be preserved.

The board of trade, without claim, voluntarily took possession of the grain, with the assent of the warehousemen, and for

the sole purpose of saving all that could be, and without their intervention it is apparent that it would all have been lost, and the warehousemen must have so regarded it when they consented.   Had it not been for the board of trade none of the grain would probably have been saved, and there would have been nothing for the warehousemen to claim.

It appears from the evidence that the warehousemen, in their written agreements, expressly reserved a lien of two cents per bushel on all grain that should be removed.   But they fail to reserve any other or further lien.   Nor is there any evidence that, during all the time the board of trade had possession, or at the time the stipulations were given, or prior to or at the sale, appellees said anything from which it can be inferred that they claimed any other lien than the two cents a bushel for the grain that should be removed.   Had they intended to insist on a further lien, we must believe that they would have notified the board of trade of their intention to enforce it, when they entered into the stipulation.   They were careful to insist upon the two cents a bushel on the grain that should be removed.   And, as rational business men, we must suppose that, had they intended to insist upon a further lien, they would have attempted to preserve it by stipulation, or at least given notice of their claim.   It is incomprehensible that they would insist upon the two cents per bushel, and not even allude to any other claim of a lien, if they intended to rely upon it after the sale.

It is a rule of interpretation, that the expression of one thing is the exclusion of other things.   We must, therefore, conclude that, when they expressly reserved the lien of two cents a bushel they intended to abandon the lien for other and further charges, and intended to look to the owners for their payment.   We can see no other reasonable conclusion.   To have notified the board of trade that they claimed such a lien was so simple and natural an act, when they claimed the two cents a bushel, that it is impossible to believe they still

intended to claim any other lien than for the two cents a bushel. Men never so act in matters involving their interests.

After the board of trade assumed control over the grain, and before the stipulations were entered into, appellees had ample time to consider and determine. the extent of their rights, and the manner in which they would enforce them; and we see that they determined to and did insist upon their lien to the extent of two cents a bushel on the grain that should be saved. It is, from all the circumstances surrounding the transaction, manifest that they did not intend to insist upon a lien on the fund which they now claim, or they would in some manner have asserted it. They made no such claim, because, as it may be presumed, they supposed all was lost, and they, with the abandonment of the grain to the fire, with it abandoned all claim for past storage, except on such as might be saved.

It is true that one of the appellees testifies that he did not intend to abandon or release his lien. This may only imply that it had not occurred to him prior to the sale that he had any other lien than was reserved by the stipulation. He, however, does not say that he reserved or intended to reserve a lien for the claim here asserted. He says he declined to act on the committee appointed by the board of trade, lest he might compromise his interests. But as he afterwards only claimed and secured his lien of two cents on the bushel of corn saved from the fire, we must conclude that was the interest he was intending to preserve.

Had appellees placed this corn in the hands of an agent, with power to sell, with directions to reserve two cents a bushel as charges, and pay the balance of the proceeds to the owners, no one would contend that they had not lost all claim of a lien on the fund for other and different charges. And in what does the present case differ? Here, the board of trade sold with the assent of appellees, they only reserving their lien for two cents on the bushel of grain removed; and it was the understanding that the sale was for the benefit of the owners,

and impliedly the balance of the fund realized after paying expenses of preserving it and paying appellees their commissions as stipulated, to be paid to the owners. By this arrangement we have no hesitation in saying that appellees not only parted with the possession, but did so in such a manner as to release all liens on the property, except such as were expressly reserved by the stipulations executed before the sale.

The charge made by appellee Buckingham, for labor and expenses incurred in preserving the grain, we regard as a proper claim against the fund. It was incurred in preserving the grain out of which the fund arises, and so far as it shall be proved to be correct it should be allowed to be deducted from the fund, and the balance divided amongst the receipt holders.

The decree of the court below is reversed and the cause remanded.

*Decree reversed.*